MASCHOFF BRENNAN
Christina L. Trinh (CA Bar No. 307879)
ctrinh@mabr.com
Sarah A. Casey (CA Bar No. 334839)
scasey@mabr.com
100 Spectrum Center Drive, Suite 1200
Irvine, CA 92618
949.202.1900

Kirk R. Harris (admitted *pro hac vice*)
kharris@mabr.com
Matthew F. Petersen (admitted *pro hac vice*)
mpetersen@mabr.com
95 S. State Street, Suite 800
Salt Lake City, UT 84111
801.297.1850

R. Parrish Freeman (admitted *pro hac vice*)
pfreeman@mabr.com
1389 Center Drive, Suite 300
Park City, UT 84098
435.252.1360

Attorneys For Plaintiff
INTEGRATED ENGINEERING, LLC

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION**

| | |
|---|---|
| Integrated Engineering, LLC, a Utah limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>EMPI, Inc., a Delaware corporation, d/b/a 034Motorsport, RacingLine Limited, a private limited company in England and Wales,<br><br>Defendants. | Case No.: 4:25-cv-09118-AMO<br><br>**PLAINTIFF INTEGRATED ENGINEERING, LLC'S REPLY CLAIM CONSTRUCTION BRIEF**<br><br>Judge: Hon. Araceli Martínez-Olguín |

## TABLE OF CONTENTS


I. INTRODUCTION ..... 1

II. ARGUMENT ..... 1

A. "local cache" ..... 2

1. The evidence does not support Defendants' proposed construction of "local cache." ..... 2

a. The intrinsic evidence does not support construing "local cache" to include volatile memory. ..... 3

b. Defendants' extrinsic evidence does not support construing "local cache" to include volatile memory. ..... 4

B. "re-program file" ..... 6

1. The evidence does not support Defendants' proposed construction of "re-program file." ..... 6

a. The intrinsic evidence supports IE's construction and that "re-program file" may include both instruction data and replacement data. ..... 6

b. Defendants' extrinsic evidence does not show IE's construction is wrong or that "re-program file" cannot include instruction data. ..... 7

2. Defendants' remaining objections provide no basis for rejecting IE's proposed construction of "re-program file." ..... 9

a. The parties dispute meaning of "re-program file" so the Court must provide a construction to resolve the dispute. ..... 9

b. IE's proposed construction that "re-program file" includes data "received by the user interface device from a server" properly clarifies the relationship expressly recited in claim 1. ..... 10

C. "configured to" ..... 10

1. Defendants do not seek a definite and contestable construction for "configured to" in any of the contexts in which the term is used in the claims. ..... 10

2. The Court need not and should not accept Defendants' invitation to decide validity in this claim construction proceeding. ..... 12

III. CONCLUSION ..... 15

## TABLE OF AUTHORITIES

**Cases**

*Apple, Inc. v. Ameranth, Inc.*,
842 F.3d 1229 (Fed. Cir. 2016) ........ 10

*Clock Spring, L.P. v. Wrapmaster, Inc.*,
560 F.3d 1317 (Fed. Cir. 2009) ........ 13

*Eon Corp. IP Holdings LLC v. Silver Spring Networks, Inc.*,
815 F.3d 1314 (Fed. Cir. 2016) ........ 1, 9, 12

*Ericsson, Inc. v. D-Link Systems, Inc.*,
773 F.3d 1201 (Fed. Cir. 2014) ........ 15

*Fantasy Sports Props., Inc. v. Sportsline.com, Inc.*,
287 F.3d 1108 (Fed. Cir. 2002) ........ 15

*Finjan, Inc. v. Secure Computing Corp.*,
626 F. 3d 1197 (Fed. Cir. 2010) ........ 14, 15

*INVT SPE LLC v. Int'l Trade Comm'n*,
46 F.4th 1361 (Fed. Cir. 2022) ........ 14

*Lazare Kaplan Int'l, Inc. v. Photoscribe Techs., Inc.*,
628 F.3d 1359 (Fed. Cir. 2010) ........ 9, 12

*Nazomi Commc'ns, Inc. v. Nokia Corp.*,
739 F.3d 1339 (Fed. Cir. 2014) ........ 15

*Netscape Commc'ns Corp. v. Konrad*,
295 F.3d 1315 (Fed. Cir. 2002) ........ 13

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
521 F.3d 1351 (Fed. Cir. 2008) ........ 1, 9

*Peters v. Active Mfg. Co.*,
129 U.S. 530 (1889) ........ 12

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) (en banc) ........ *passim*

*Puff Corp. v. SHO Prods.*,
LLC, No. CV 22-2008-GW-KSX, 2024 WL 2208929 (C.D. Cal. Apr. 19, 2024) ........ 13

*Quest Integrity USA, LLC v. Cokebusters USA Inc.*,
924 F.3d 1220 (Fed. Cir. 2019) ........ 13

*Radware, Ltd. v. F5 Networks, Inc.*,
147 F. Supp. 3d 974 (N.D. Cal. 2015) .......... 15

*Silicon Graphics, Inc. v. ATI Techs., Inc.*,
607 F.3d 784 (Fed. Cir. 2010) .......... 14

*Verizon Servs. Corp. v. Cox Fibernet Va., Inc.*,
602 F.3d 1325 (Fed. Cir. 2010) .......... 9

*VLSI Tech. LLC v. Intel Corp.*,
53 F.4th 646 (Fed. Cir. 2022) .......... 10

## I. INTRODUCTION

IE's proposed constructions, as set forth in its Opening Claim Construction Brief (Dkt. 152 ("Opening Brief")) and particularly in light of Defendants' Responsive Claim Construction Brief (Dkt. 153 ("Response")), reflect the only interpretations of the disputed terms rooted in the specification of the '159 patent. And while IE's proposed constructions are not critical to the ultimate disposition of this case, construing these terms in accordance with the specification will aid the fact finder in understanding what the '159 patent teaches and how the patented system differs from conventional vehicle flashing systems.

Defendants' proposed constructions, conversely, appear to exist for the sole purpose of rebutting IE's constructions. Defendants identify virtually no intrinsic evidence affirmatively supporting their positions. Their extrinsic evidence, anchored in the opinions of Defendants' expert, Mr. Stuart—who neither establishes that he is a POSITA nor identifies the applicable level of ordinary skill in the art—fails to shed light on how a POSITA would understand the disputed terms in light of the '159 patent's specification. And Defendants supplement these deficiencies with exactly what the Federal Circuit has instructed courts not to resolve at claim construction: "questions that do not go to claim scope" and "improper attorney argument." *Eon Corp. IP Holdings LLC v. Silver Spring Networks, Inc.*, 815 F.3d 1314, 1319 (Fed. Cir. 2016). This includes Defendants' premature and erred invalidity argument resting on a misapplication of Federal Circuit precedent and erroneous factual premises. The Court need not entertain any of this. As to the claim construction issues properly before the Court, IE's proposed constructions are the only ones grounded in the teachings of the '159 patent and should therefore be adopted.

## II. ARGUMENT

The purpose of claim construction is to determine the meaning and scope of the asserted claims and resolve actual disputes between the parties concerning that scope. *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360–62 (Fed. Cir. 2008). In doing so, courts look principally to the intrinsic evidence, with the specification being "the single best guide to the meaning of a disputed

term." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005) (en banc). Extrinsic evidence—such as expert testimony and dictionaries—"is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Id.* at 1319. Rather than engage with the specification's teachings in construing the disputed terms, Defendants repeatedly invoke a boilerplate passage from the patent stating that terminology may be interpreted in its "broadest reasonable manner." (Dkt. 153 at 6–7, 14, 19–21, 25–26.) But that boilerplate passage does not obviate the need to interpret disputed terms "in the context of the entire patent, including the specification." *Phillips*, 415 F.3d at 1313. Here, the '159 patent describes a particular system for reliably receiving, storing, and using specific information to direct and verify the flashing of a vehicle's ECU, thereby reducing the risk of corruption if the flashing process is interrupted.[1] It is in the context of this system and the problem it addresses that Defendants' proposed constructions must be evaluated.

**A. "local cache"**

**1. The evidence does not support Defendants' proposed construction of "local cache."**

Defendants propose construing "local cache" as "[m]emory on a device that can store data" without regard to whether the "memory" is persistent (i.e., non-volatile) or temporary (i.e., volatile). (Dkt. 153 at 23–28.) This construction is incredibly broad, encompassing essentially any memory on the programming device, including ordinary and typically volatile processor memory, which the '159 patent specifically distinguishes from the local cache that stores data for later use in reprogramming. ('159 patent, 3:19–24, 4:63–65; Dkt. 152 at 16–18.) Defendants' construction therefore fails to account for the distinct role of the local cache in the claimed system, and they fail to identify any intrinsic or extrinsic evidence to remedy this deficiency.

---

[1] The '159 patent does not broadly claim the concept of flashing a vehicle, and Defendants oversimplify the claimed invention by reducing it to an image of a purportedly longstanding Nissan flashing system. (Dkt. 153 at 5.) At most, the image depicts the use of a laptop and dongle to flash a vehicle; it does not depict the particular data-staging architecture claimed in the '159 patent.

**a. The intrinsic evidence does not support construing "local cache" to include volatile memory.**

The term "local cache" must be understood "in the context of the entire patent, including the specification." *Phillips*, 415 F.3d at 1313. The specification of the '159 patent, which includes its claims, requires the cache to store data for later use in reprogramming. ('159 patent at, *e.g.*, claim 1 ("the programming device is configured to . . . **store**, via defined operations with a **local cache**, one or combinations of . . . **mapping-and-byte data** [and then] . . . **re-program** the at least one onboard module **using the mapping-and-byte data**")). Defendants' proposed construction of "local cache" as "[m]emory on a device that can store data" is problematic because Defendants do not view "stor[ing] data" as requiring any degree of preservation of the stored data for later use. That is, they propose that volatile memory is sufficient and that non-volatile memory is not required. This disregards the specification's express distinction between the local cache, in which mapping-and-byte data is stored, staged, and verified, and volatile processor memory, into which that data is subsequently loaded when called for use in reprogramming. ('159 patent, 15:23–29, 15:45–16:15, Figs. 5G–5H; Dkt. 152 at 18–19.) If the local cache does not use non-volatile memory, the data stored there may be overwritten and thus unavailable for use in reprogramming. Defendants' construction, or rather their insistence that "to store data" for later use does not require non-volatile memory, fails to account for a central purpose of the '159 patent: avoiding failed or corrupted reprogramming operations by staging and preserving data notwithstanding potential disruptions. ('159 patent, 3:54–4:34, 5:8–40.) That purpose cannot be served if the local cache uses volatile memory, which does not preserve its contents through a loss or interruption of power.

Defendants identify no intrinsic evidence affirmatively supporting their proposed construction's inclusion of volatile memory. (Dkt. 153 at 24–27.) They instead contend that the specification's standard avoidance of unnecessarily limiting language somehow expands the scope of the claims. They cite no authority for this proposition because there is none. The claims cannot be construed to cover something that the inventors did not invent and did not describe in the specification—and there is no

description of a system capable of reprogramming an onboard module using data stored in a manner that does not ensure its preservation and availability for such use. The construction of "local cache" thus cannot include volatile memory, which is incapable of such preservation.

**b. Defendants' extrinsic evidence does not support construing "local cache" to include volatile memory.**

Defendants derive their understanding of "cache" from extrinsic evidence, assert that "[t]here is nothing in the '159 patent that would change this understanding," and proceed to attack the intrinsic evidence supporting IE's construction. (Dkt. 153 at 25–27.) This inverts the claim construction inquiry prescribed by *Phillips*, treating the specification as a potential basis for departing from an extrinsically derived meaning rather than as "the single best guide to the meaning of a disputed term." 415 F.3d at 1315. Indeed, this problematic approach was among the motivating factors behind *Phillips* becoming an en banc precedential opinion. *Id.* at 1320 (holding that to "limit[] the role of the specification in claim construction to serving as a check on the dictionary meaning of a claim term" is to "improperly restrict[] the role of the specification in claim construction").

Extrinsic evidence is unlikely to yield a reliable construction unless "considered in the context of the intrinsic evidence." *Id.* at 1319. Defendants' cited dictionaries and textbooks not only disregard that context but fail even to support Defendants' own proposed construction of "local cache" as merely "[m]emory on a device that can store data," which they view as including both volatile and non-volatile memory. Indeed, as Defendants acknowledge, these references describe caches as having particular characteristics, including that they are "small," "fast," and/or "temporary." (Dkt. 153 at 24–25.) Yet Defendants' proposed construction requires none of these characteristics and effectively eliminates any distinction between a cache and memory generally. And more fundamentally, each of these references concerns conventional processor caches—not caches serving the function described in the '159 patent—and Mr. Stuart acknowledged that he did not believe any of his cited references specifically concerned vehicle flashing. (Dkt. 152-1, Ex. 3 ("Stuart Tr.") at 72:18–73:24.) Defendants' reliance on

these references thus improperly "focuses the inquiry on the abstract meaning of words rather than on the meaning of claim terms within the context of the patent." *Phillips*, 415 F.3d at 1321.

In line with the context of the '159 patent specification, Mr. Stuart acknowledged that caches *can* employ non-volatile memory and that the choice of memory would "depend on the design and intent of the system" and, specifically with respect to caches, is "entirely dependent on the system design." (Stuart Tr. 77:16–24, 78:18–20, 80:12–20.) Yet, perplexingly, Mr. Stuart derives his proposed construction from generalized definitions of "cache," and disregards the very context that—by his own reasoning—should inform his analysis. (Dkt. 155 ("Stuart Decl."), ¶¶ 2, 21–27.)

It is precisely this context that informs IE's expert, Mr. Loudon, in determining how a POSITA would understand "local cache." (Dkt. 152-1, Ex. 2 ("Loudon Decl."), ¶¶ 47–60.) In attempting to rebut Mr. Loudon's analysis, Defendants repeatedly emphasize that the specification's disclosures concerning erase-and-write operations and Bluetooth communications—which Mr. Loudon identifies as indicative of non-volatile memory—are exemplary and that the claims do not expressly require either. (Dkt. 153 at 26–27.) But IE relies on these disclosures not to import particular operations or communication protocols into the claims, but because they inform a POSITA's understanding of the type of memory employed as the local cache, and required if that cache is to store data for later use. Similarly, Defendants' observation that volatile memory can also be "erased" does not address the technical significance of the particular erase-and-write operations described in the specification or otherwise preclude a POSITA from understanding the claimed local cache to be non-volatile memory. (*Id.*) Ultimately, neither Defendants nor Mr. Stuart offer a competing explanation of how the design and purpose of the patented system inform the meaning of "local cache," much less one that supports Defendants' proposal that it includes volatile memory.

### B. "re-program file"

#### 1. The evidence does not support Defendants' proposed construction of "re-program file."

Defendants propose affording "re-program file" its plain and ordinary meaning, but do little to articulate that meaning beyond stating that it is "a file used for re-programming." (Dkt. 153 at 23.) Their arguments, while opaque, make apparent that they interpret the term to encompass a single file containing only the replacement data, and no instruction data, to be written to the onboard vehicle module, reasoning that re-program files need not contain instructions. (*Id.* at 19–21, 23.) In doing so, Defendants again contravene *Phillips*, 415 F.3d at 1313, by interpreting the term in the abstract, based on their expert's testimony, rather than in the context of the '159 patent. IE's proposed construction, by contrast, clarifies what a POSITA would understand a "re-program file" to be in the context of the claimed system.

##### a. The intrinsic evidence supports IE's construction and that "re-program file" may include both instruction data and replacement data.

Defendants identify no intrinsic evidence affirmatively supporting a "plain and ordinary meaning" construction, or their implied interpretation of what a "re-program file" can and cannot contain. (Dkt. 153 at 19–21.) Instead, Defendants argue that the patentees neither acted as their own lexicographers nor disavowed claim scope and that the embodiments on which IE relies are exemplary. (*Id.*) But IE's reliance is proper. IE does not seek to depart from the plain and ordinary meaning of "re-program file" or incorporate particular operations described in the specification into the claims. Rather, the significance of these disclosures is in what they teach a POSITA about the nature of the re-program file and the information it contains. That the particular operations, their sequence, or the manner in which they are performed may vary does not diminish the significance of the specification's consistent teachings that the re-program file contains all the information—replacement data and instruction data—required for directing the reprogramming process. (*See* '159 patent, 3:35–53, 6:40–47, 17:16–35.)

Defendants further contend that the embodiment depicted in Figures 7A–7B is not even covered by the claims because the programming device recited in claim 1 receives "mapping-and-byte data," which Defendants seem to distinguish from the re-program file itself. (*Id.* at 21.) But this argument disregards the relationship between the mapping-and-byte data expressly claimed and used in claim 1 and the re-program file. The specification explains that the claimed sequence of messages provides "specific portions of a re-program file" to the programming device. ('159 patent, 3:35–43; Dkt. 152 at 8, 11–13, 16.) Indeed, the specification describes the programming device performing operations "as defined by the re-program file" and "executing a re-program file with operation groups." ('159 patent, 6:40–47, 17:26–35.) These disclosures inform a POSITA's understanding of the nature of the information contemplated by claim 1's mapping-and-byte data requirements, including protocol map metadata, protocol map information, and a data map. The specification's teachings concerning the contents of the re-program file are thus directly relevant to claim 1, which recites the programming device receiving and using portions of that file in the form of mapping-and-byte data rather than the file in its entirety.

Finally, Defendants identify no intrinsic evidence supporting their assertion that "[a] file" necessarily means one file rather than multiple files, stating instead that they "do not fully understand" why IE seeks its proposed construction. (Dkt. 153 at 23.) Yet Defendants acknowledge that a single container file, such as a ZIP file, can contain multiple constituent files. (*Id.*; *see* Dkt. 152 at 14.) IE's construction simply recognizes that a re-program file may encompass multiple constituent files, whether packaged together or otherwise. Defendants identify nothing in the claims or specification suggesting that the context dictates otherwise.

**b. Defendants' extrinsic evidence does not show IE's construction is wrong or that "re-program file" cannot include instruction data.**

Defendants identify little extrinsic evidence supporting their interpretation of "re-program file" beyond Mr. Stuart's opinions, which largely concern how re-program files may be used in vehicle flashing systems generally rather than how a POSITA would understand the term in the context of the

’159 patent. (Dkt. 153 at 19–23; Stuart Decl. ¶¶ 3–6, 14–19.) To the extent Mr. Stuart addresses the specification, he largely reiterates Defendants’ arguments concerning the intrinsic evidence, which are unpersuasive for the reasons discussed above. Moreover, Mr. Stuart has not established that he is a POSITA and expressly declines to identify the applicable level of ordinary skill in the art. (Dkt. 152 at 6–7; Stuart Decl. ¶ 2.) His opinions do little to assist the Court in determining “what a person of ordinary skill in the art would understand claim terms to mean.” *Phillips*, 415 F.3d at 1319.

Defendants instead rely heavily on selective citations to Mr. Loudon’s deposition testimony to support their interpretation of “re-program file.” (Dkt. 153 at 19–20.) Unlike Mr. Stuart, however, Mr. Loudon distinguished re-program files used in certain specialized vehicle flashing systems from those described in the ’159 patent. (Dkt. 152 at 13.) Indeed, Mr. Loudon expressly testified that re-program files containing only replacement data are used “in a completely different context than this patent” and reaffirmed his understanding that the re-program file described in the ’159 patent contains information beyond the data to be written to the onboard vehicle module. (Dkt. 154-5 (“Loudon Tr.”) at 107:14–24.) Thus, far from improperly importing limitations from the specification, Mr. Loudon’s reliance on its teachings reflects the inquiry prescribed by *Phillips*: determining how a POSITA would understand the disputed term in the context of the patent. 415 F.3d at 1313, 1323–24. Unable to reconcile their interpretation with Mr. Loudon’s testimony concerning the contents of the re-program file, Defendants mischaracterize his subsequent testimony in asserting that he “admitted” that IE’s construction imports limitations from the specification. (Dkt. 153 at 20.) Although Defendants represent that Mr. Loudon was asked whether claim 1 requires instructions to come “as part of the re-program file,” the question actually posed concerned where instructions come from, specifically, the transmission of instructions from the user interface device to the programming device—not the contents of the re-program file itself. (Loudon Tr. 109:9–18.) Accordingly, Mr. Loudon’s testimony neither undermines his opinions concerning the contents of the re-program file nor supports Defendants’ interpretation of that term.

**2. Defendants' remaining objections provide no basis for rejecting IE's proposed construction of "re-program file."**

Defendants' remaining arguments concern whether the re-program file itself constitutes a separate claim limitation and whether IE's proposed construction incorporates language already recited in claim 1. Neither argument bears on the proper construction of "re-program file."

**a. The parties dispute meaning of "re-program file" so the Court must provide a construction to resolve the dispute.**

Defendants advance a proposed construction for "re-program file," namely "plain and ordinary meaning," with their own unstated but implied view of what that meaning is. IE proposes a specifically articulated construction with which Defendants do not agree. Because the parties dispute the meaning of "re-program file," the Court is obligated to resolve the dispute by providing a construction. *O2 Micro*, 521 F.3d at 1362 ("When the parties present a fundamental dispute regarding the scope of a claim term, it is the court's duty to resolve it."). Moreover, "[a] determination that a claim term 'needs no construction' or has the 'plain and ordinary meaning' may be inadequate when a term has more than one 'ordinary' meaning or when reliance on a term's 'ordinary' meaning does not resolve the parties' dispute." *Id.* at 1361.

Defendants' argument that the "re-program file" is not itself a claim limitation need not and should not be resolved in this proceeding, as it goes solely to the question of what will be required to prove infringement, and not at all to the separate question of claim scope. The Federal Circuit has made clear that "courts should not resolve questions that do not go to claim scope, but instead go to infringement, *Lazare Kaplan Int'l, Inc. v. Photoscribe Techs., Inc.,* 628 F.3d 1359, 1376 (Fed. Cir. 2010), or improper attorney argument, *Verizon Servs. Corp. v. Cox Fibernet Va., Inc.,* 602 F.3d 1325, 1334 (Fed. Cir. 2010)." *Eon Corp.*, 815 F.3d at 1318–19 (also holding that leaving claim scope dispute to jury under plain meaning instruction was legal error).

**b. IE's proposed construction that "re-program file" includes data "received by the user interface device from a server" properly clarifies the relationship expressly recited in claim 1.**

Defendants also object to IE's inclusion of "received by the user interface device from a server" in its proposed construction because that relationship is already recited in claim 1. (Dkt. 153 at 22.) But Defendants do not dispute that claim 1 requires precisely that relationship, as their own expert acknowledged. (Dkt. 152 at 15 (citing Stuart Tr. 51:7–11, 53:17–54:3).) IE's construction merely clarifies the re-program file's role within the claimed system without imposing any additional limitation. Although Defendants' cited authorities recognize a preference for avoiding constructions that render express claim language redundant, they do not establish that such constructions are impermissible. Indeed, in addressing the very principle articulated in *Apple, Inc. v. Ameranth, Inc.*, 842 F.3d 1229, 1237 (Fed. Cir. 2016)—on which Defendants rely—the Federal Circuit subsequently explained that "[w]hile a construction that introduces redundancy into a claim is disfavored, it is not foreclosed," particularly where "intrinsic evidence makes it clear that the 'redundant' construction is correct." *VLSI Tech. LLC v. Intel Corp.*, 53 F.4th 646, 653 (Fed. Cir. 2022). Here, Defendants' objection to the inclusion of an undisputed relationship in IE's proposed construction provides no basis for rejecting a construction otherwise supported by the intrinsic evidence.

**C. "configured to"**

**1. Defendants do not seek a definite and contestable construction for "configured to" in any of the contexts in which the term is used in the claims.**

Defendants propose construing "configured to" as follows: "When a thing is recited as being 'configured to' perform a function, it means the thing is structured or arranged to be able to perform the function, and does not require that the function actually be performed." (Dkt. 153 at 10.) IE does not dispute the distinction between capability and actual performance reflected in Defendants' proposed construction. IE objects to construing "configured to" in blanket fashion, without regard to the thing

being configured or what it is being configured to do. Defendants do not even colorably engage in claim construction as to the scope of any of the "configured to" limitations in claim 1:

> . . . a user interface device . . . **configured to**:
>
> > receive and store a re-program file from a server; and
> >
> > display a graphical user interface **configured to** receive a user input to initiate a re-program process for at least one onboard module of a vehicle; and
>
> a programming device **configured to** be physically and communicably coupled to an onboard port of the vehicle, wherein
>
> > the onboard port is **configured to** be communicably coupled with the at least one onboard module,
> >
> > the programming device is **configured to** be communicably coupled, via a wired or wireless communication, to the user interface device, and
>
> the programming device is **configured to**:
>
> > receive, via a defined sequence of messages with the user interface device, and store, via defined operations with a local cache, one or combinations of: data checksum map metadata, protocol map metadata, data checksum map information, protocol map information, and a data map (collectively, mapping-and-byte data);
> >
> > in response to receiving an instruction message from the user interface device, re-program the at least one onboard module using the mapping-and-byte data; and
> >
> > in response to determining a checksum condition is satisfied, transmit a re-program success message to the user interface device.

('159 patent, claim 1.)

Defendants cite neither intrinsic nor extrinsic evidence to support a blanket application of a singular "configured to" meaning for every affected claim limitation, regardless of context. Nor do they cite any legal authority endorsing such an approach.

**2. The Court need not and should not accept Defendants' invitation to decide validity in this claim construction proceeding.**

Defendants' proposed construction is ultimately an effort to use claim construction to establish that the '159 patent is invalid based on an early version of IE's POWERlink V4 programming device. But a claim construction proceeding is neither the time nor the vehicle for Defendants' invalidity argument. As noted above, when deciding claim construction "courts should not resolve questions that do not go to claim scope, but instead go to infringement," *Eon Corp.*, 815 F.3d at 1318–19, which is the same thing as the anticipation analysis Defendants attempt to present here, *Peters v. Active Mfg. Co.*, 129 U.S. 530, 537 (1889) ("That which infringes, if later, would anticipate, if earlier."). *See also Lazare Kaplan Int'l, Inc. v. Photoscribe Techs., Inc.*, 628 F.3d 1359, 1376 (Fed. Cir. 2010) ("This court agrees with the Defendants that the parties' dispute concerns factual questions relating to the test for infringement and not the legal inquiry of the appropriate scope of the 'positional accuracy' limitation"). This Court should not take up Defendants' validity challenge at this time by agreeing to an unbounded "construction" for "configured to," but should wait and decide validity based on the facts and supported by evidence, when properly presented.

Further, even setting aside the procedural impropriety, Defendants' belief regarding the bearing of "configured to" on validity is both factually and legally incorrect.

In attempting to argue that an early version of IE's POWERlink V4 programming device possessed the capabilities required by claim 1, Defendants expressly contend that "[i]t matters not whether a user interface device was ready to play along, or whether the code was accessible to the public." (Dkt. 153 at 13.) Defendants are wrong. It matters immensely to the question of whether the **system claims** of the '159 patent are invalid as anticipated by IE's sale of **one of that claimed system's components**. Each and every claim of the '159 patent is a system claim. Claim 1 recites "[a] system for

staging data and updating vehicle modules using staged data," with "the system comprising" at least "a user interface device" and "a programming device" that interact variously with other system components including "a server" and "at least one onboard module of a vehicle." ('159 patent, claim 1.) All of the remaining claims (claims 2–18) depend from claim 1 either directly or indirectly and thus carry all of these system limitations. Thus, even if it were true that the patented staging technology of the early POWERlink V4 programming device, on its own, was accessible to the public and available for use before the critical date, that would not show an invalidating prior sale or prior public use of the patented system, which includes other components.

Federal Circuit precedent regarding invalidating prior sales and offers could not be more clear on this point: "When the asserted basis of invalidity is an on-sale bar, the court should determine 'whether the subject of the barring activity **met each of the limitations of the claim**, and thus was an embodiment of the claimed invention.'" *Netscape Commc'ns Corp. v. Konrad*, 295 F.3d 1315, 1323 (Fed. Cir. 2002) (quoting *Scaltech Inc. v. Retec/Tetra, L.L.C.*, 178 F.3d 1378, 1383 (Fed. Cir. 1999)) (emphasis added); *Quest Integrity USA, LLC v. Cokebusters USA Inc.*, 924 F.3d 1220, 1227 (Fed. Cir. 2019) (same). The same holds for invalidating prior public use: "In order for a use to be public within the meaning of § 102(b), **there must be a public use with all of the claim limitations**." *Clock Spring, L.P. v. Wrapmaster, Inc.*, 560 F.3d 1317, 1325 (Fed. Cir. 2009) (emphasis added). *See also Puff Corp. v. SHO Prods.*, LLC, No. CV 22-2008-GW-KSX, 2024 WL 2208929, at *21 (C.D. Cal. Apr. 19, 2024) (citing and quoting *Clock Spring*).

The facts and evidence required to address Defendants' invalidity attack are just as presently unavailable to IE as they are to Defendants, given the confined nature of this claim construction proceeding. Notwithstanding, IE must state some facts that show Defendants are wrong there as well. First, what IE sells is the POWERlink V4 programming device—i.e., the dongle used by the patented system—not the whole system. So, as noted above, even if IE had sold or offered the POWERlink V4 dongle, with the patented staging technology, before the critical date, doing so could not have amounted to an invalidating prior public use or prior sale **of the patented system**. Second, and no less significant,

is that the public could not access the patented staging technology except through the mobile application, which was not released until several months after the critical date. As Defendants acknowledge, IE has maintained, and continues to maintain, that the POWERlink V4 dongles were not "capable of use with a system functioning in accordance with the claims" of the '159 patent. (Dkt. 153 at 12.) The claimed system did not exist prior to the critical date in a form that would allow the public to utilize the patented staging technology. For that, the public would have to wait for the release and integration of the mobile application, several months after the critical date.

Defendants rely on *Finjan, Inc. v. Secure Computing Corp.* for its holding that, "to infringe a claim that recites capability and not actual operation, an accused device 'need only be capable of operating' in the described mode." 626 F.3d 1197, 1204 (Fed. Cir. 2010) (quoting *Intel Corp. v. U.S. Int'l Trade Comm'n*, 946 F.2d 821, 832 (Fed. Cir. 1991)). What Defendants overlook, however, is *Finjan*'s explanation of what such capability requires, particularly for a software-based system. There, the accused products contained software modules that performed the claimed functions, but those modules were locked and required customers to purchase activation keys before they could be used. *Id.* at 1201–02, 1205. That is, they were available to the purchasing public, if the public wanted to purchase. The Federal Circuit explained that, to be capable of performing a claimed function, the code of the accused apparatus must be "written in such a way as to ***enable a user*** of that software to utilize the function . . . without having to modify that code"—and found that the customer's ability to unlock the existing functionality through an activation key satisfied that requirement. *Id.* at 1205 (emphasis added) (quoting *Fantasy Sports Props., Inc. v. Sportsline.com, Inc.*, 287 F.3d 1108, 1118 (Fed. Cir. 2002)). Thus, although a user need not actually utilize the claimed functionality, the system must already possess that functionality in a form that enables its use without further modification. *Id.*

Other decisions addressing similar computer-implemented system claims have consistently recognized this requirement. *See, e.g.*, *INVT SPE LLC v. Int'l Trade Comm'n*, 46 F.4th 1361, 1373–74 (Fed. Cir. 2022) (requiring capability "without any modification or further programming"); *Silicon Graphics, Inc. v. ATI Techs., Inc.*, 607 F.3d 784, 794 (Fed. Cir. 2010) (requiring functionality "without

having to modify [the product]”); *Ericsson, Inc. v. D-Link Systems, Inc.*, 773 F.3d 1201, 1216–17 (Fed. Cir. 2014) (applying *Finjan* to computer-implemented apparatus claims and distinguishing devices that are capable of performing the claimed functions from those that could be altered to do so); *Nazomi Commc'ns, Inc. v. Nokia Corp.*, 739 F.3d 1339, 1345–46 (Fed. Cir. 2014) (distinguishing the activation of existing functionality in *Finjan* from the addition of software necessary to enable the claimed functionality); *Radware, Ltd. v. F5 Networks, Inc.*, 147 F. Supp. 3d 974, 1004 (N.D. Cal. 2015) (“Thus, like in *Fantasy Sports*, F5’s products infringe if they contain code ‘written in such a way as to enable a user of that software to utilize the [claimed] function . . . without having to modify that code.’”).

## III. CONCLUSION

For the reasons stated above, the Court should adopt IE’s proposed constructions and reject Defendants’ proposed constructions.

DATED: November 25, 2026

Respectfully submitted,

MASCHOFF BRENNAN

By: /s/ R. Parrish Freeman
*Attorneys for Plaintiff*
*Integrated Engineering, LLC.*